# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2025

Lyle W. Cayce
Clerk

No. 24-50044

Cynthia Wilson; Nicholas Angelo; Erin Angelo,

*Plaintiffs—Appellants*,

*versus*

Centene Management Company, L.L.C.; Celtic Insurance Company; Superior HealthPlan, Incorporated; Centene Company of Texas, L.P.,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-484

Before Dennis, Southwick, and Engelhardt, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

We withdraw the prior opinion, 144 F.4th 780 (5th Cir. 2025), and substitute the following.

The Plaintiffs in this case asserted breach-of-contract claims against the Defendant insurance companies, alleging the provider lists were materially inaccurate, thereby causing the Plaintiffs and proposed class members to pay artificially inflated premiums. The district court denied class

certification after concluding the Plaintiffs lacked standing because they failed to establish an injury in fact. Finding error in that standing determination, we VACATE and REMAND for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs, who include the proposed class representatives Cynthia Wilson, Erin Angelo, and Nicholas Angelo, brought suit on behalf of all individuals residing in Texas who, from January 1, 2014, through December 31, 2021, purchased a policy under the "Ambetter from Superior HealthPlan" sold and managed by the Defendants: Centene Management Company, L.L.C., Celtic Insurance Company, Superior HealthPlan Inc., and Centene Company of Texas, L.P. (collectively, "Superior"). The Plaintiffs entered health insurance contracts under the Ambetter plan through the Texas Health Insurance Exchange, Texas's Affordable Care Act ("ACA") marketplace website.

After obtaining coverage under the policy, each Plaintiff was unable to obtain certain healthcare providers listed by Ambetter in its in-network provider directory. The Plaintiffs allege Superior's list of available providers supplied via the Ambetter plan was materially inaccurate, containing thousands of names of providers who were not, in fact, available to provide medical care. As a result, the Plaintiffs and proposed class members were overcharged when they paid artificially inflated premiums for access to providers who were not available.

As an insurance provider under the ACA, Superior is regulated by both Texas and federal law. Network adequacy is a federal requirement, meaning the network must be "sufficient in number and types of providers." 45 C.F.R. § 156.230(a)(1)(ii) (2026). Additionally, federal regulations require Superior to provide consumers with access to an "up-to-date, accurate, and complete provider directory" that is "easily accessible," a

requirement that is met when "all of the current providers for a plan" are listed "in the provider directory on the issuer's public Web site." § 156.230(b)(2).  The Texas Department of Insurance is responsible for overseeing and regulating the Ambetter plan and ensuring Superior's adherence to pertinent rules and regulations.

Superior's Ambetter plan is an Exclusive Provider Organization policy, which requires policyholders to use in-network healthcare providers. The marketplace website provides information including monthly prices, co-pay amounts, deductibles, and out-of-pocket maximums; it does not, however, supply in-network provider lists for any given plan.  Instead, it provides links to an individual plan's provider directory.  Ambetter uses a provider search engine, which allows users to access a subset of Ambetter providers based on the criteria a user puts into the search engine.  At a minimum, these criteria include desired provider specialty and location. Superior's brief on appeal states that users do not have a means to view a comprehensive list of Ambetter's in-network providers because the results are always limited by the search criteria.

The Plaintiffs allege that Ambetter's provider directories were materially inaccurate.  As a result, they allegedly paid artificially inflated premiums for access to providers who were not available to them.  We examine the details for two of the Plaintiffs.

Plaintiff Cynthia Wilson, a breast cancer patient, purchased the Ambetter plan in January 2017 after reviewing the directory of in-network providers.  Shortly thereafter, Ambetter assigned her a primary-care provider.  Later that year, Wilson developed shingles and was referred to her Ambetter-assigned physician.  The assigned physician, unhelpfully, was a pediatrician.  Trying to identify a physician who could assist her, Wilson contacted nine physicians on Ambetter's provider list — none of whom

accepted the Ambetter policy.  Ultimately, Wilson consulted an out-of-network physician to receive care for her medical condition and switched insurance policies.  She was never able to use her Ambetter policy to see a healthcare provider.

Plaintiffs Erin and Nicholas Angelo also reviewed the Ambetter provider directory prior to purchasing their policy in December 2016.  At the time, Erin was pregnant with twins in a single amniotic sac, which was a high-risk pregnancy, requiring the care of a maternal-fetal medicine specialist. One reason the Angelos selected the Ambetter policy was that Erin's obstetrician with a specialty in maternal-fetal medicine was listed as an in-network provider.  Shortly after purchasing the policy, Erin discovered the obstetrician had stopped accepting Ambetter insurance due to Ambetter's poor payment record.  The Angelos searched for another in-network obstetrician with the same specialty but found none nearby.  Ambetter offered a maternal-fetal medicine specialist in Houston, which was a four-hour drive from the Angelos' home in Pflugerville.  Without an in-network specialist nearby, the Angelos used their own funds to pay Erin's original obstetrician.

As the time for delivery approached, Ambetter referred Erin to a clinic and then refused to pay the bill.  The clinic refused to deliver her babies. Ambetter then referred her to an obstetrician at a free clinic who delivered the twins at an in-network hospital.  The premature twins required care in the hospital's neonatal intensive care unit, which resulted in a bill for just over $20,000.  Again, Ambetter refused to pay.  The Angelos spent the next two years disputing the bill and ultimately negotiated a settlement, requiring them to pay $1,500.

The Plaintiffs filed this class action, asserting breach of contract, breach of warranty, and claims under the Texas Deceptive Trade Practices

Act. Upon Superior's motion to dismiss, the magistrate judge recommended dismissing the breach-of-warranty and Deceptive Trade Practices Act claims. He concluded the Plaintiffs adequately pled a breach-of-contract claim, referring to the "specific promises and obligations Defendants made to Plaintiffs in the Ambetter Contract in exchange for their premium payments." These "promises include[d] providing insureds with an accurate list of network providers; '[c]omplete medical coverage that meets [their] medical needs and contains all of the Essential Health Benefits;' a [Qualified Health Plan] that [Superior] has certified meets ACA's network adequacy requirements; and adequate access to physicians and medical practitioners and treatments or services." The alleged breach of these promises resulted in the Plaintiffs' damages. The district court agreed, and the breach-of-contract claim survived.

The Plaintiffs moved for class certification, arguing the Plaintiffs and the class had Article III standing. Relying on their expert's report, the Plaintiffs alleged that Ambetter's provider directory "contains on average 49% of practitioners who are in fact not active network participants." Further, a "portion of every Ambetter policyholder's premium represents payment for the availability of the providers published" such that "every 1% change in network size is associated with a 0.29% change in policy premium." They alleged that each policy holder had been overcharged "[t]o the extent th[e] published list is inaccurate."

Superior opposed the motion, contending the Plaintiffs' class-wide injury theory of overpayment based on an overstated provider list was invalid because Superior never promised "a specific number of providers." Because the Plaintiffs' "damages model [was] based solely on this invalid theory," Superior asserted the Plaintiffs failed to establish the concrete injury in fact required to establish Article III standing.

Superior also moved to strike the testimony of the Plaintiffs' damages expert. Among its arguments was that the expert's class-wide damages model neither "fit the facts" nor the Plaintiffs' theory of liability. Superior maintained the model did not fit the facts because it was based on the counterfactual assumption "that Superior promised its customers a certain network 'breadth' — defined as the number of in-network providers in proportion to the number of providers in the area — but Superior [] never made any such promise." Relatedly, Superior argued the model did not fit the Plaintiffs' theory of liability — breach of a contractual promise to provide a current directory — because a current directory is not synonymous with a directory of a certain breadth, and the expert failed to measure damages from an inaccurate directory.

The district court referred both motions to a different magistrate judge. The magistrate judge denied Superior's motion to strike because Superior "contest[ed] the basis of the [expert's] opinion," which should "go to the weight of and not admissibility of [the expert's] testimony." He further recommended denying the Plaintiffs' motion for class certification. Characterizing the Plaintiffs' injury argument as an "overcharge-by-fraud theory," the magistrate judge concluded that "Plaintiffs have not pleaded facts sufficient to show that they had reasonable expectations with respect to the size of the provider network such that the prices paid for access to the network were inflated."

In reaching this conclusion, the magistrate judge faulted the Plaintiffs' expert opinion, stating: "The assumption underlying Plaintiffs' overcharge theory is that network size meaningfully accounts for higher premiums," but the Plaintiffs' expert model only showed "correlation, not causation." Because the model failed to account for other factors which impact the cost of premiums, the Plaintiffs failed to "adequately establish[] that the value of the service for which they paid is measured primarily by network size, and

that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size." Accordingly, the magistrate judge concluded the Plaintiffs had not "plausibly pleaded an injury in fact" and therefore lacked standing to bring their claim. Because the suit did not "present a justiciable case or controversy under Article III," the magistrate judge did not reach the class-certification question. The Plaintiffs objected to the Report and Recommendations.

The district court adopted the Report and Recommendations and denied the Plaintiffs' motion for class certification. The Plaintiffs timely petitioned for leave to appeal under Federal Rule of Civil Procedure 23(f), which this court granted. The district court stayed the case pending the resolution of this appeal.

## DISCUSSION

The Plaintiffs contend the district court erred in determining they lacked standing because (1) the court applied an incorrect legal standard to the causation element of standing, (2) the court wrongly characterized their injury theory as relying on the promise of a network of a particular size, (3) they pled sufficient facts to show injury in fact, and (4) the court improperly engaged in a merits-based evaluation of their expert testimony, impermissibly choosing a side in the "battle of the experts." We address these issues in order.

### I.    *Individual Standing*

Generally, appeals under Rule 23(f) only permit consideration of the issue of class certification, but because the district court's denial of the Plaintiffs' motion for class certification was premised on their lack of individual standing, we must address standing. *See Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry."). Standing is a question of law

that we review *de novo*, while any fact-finding is reviewed for clear error. *Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 305–06 (5th Cir.), *cert. denied*, 145 S. Ct. 774 (2024). Whether a plaintiff has standing "is the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish standing, the plaintiff bears the burden of showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the Defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

In the class-action context, the class representative must establish his standing as an individual before he may represent a class of other allegedly injured persons. *See Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 733–34 (5th Cir. 2023); *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). "After all, if the class representative lacks standing, then there is no Article III suit to begin with — class certification or otherwise." *Flecha*, 946 F.3d at 769. Accordingly, if the class representative lacks individual standing, as the district court concluded here, that issue must be addressed before determining whether he has standing to represent the class and deciding class certification. *See id.*; *Angell*, 67 F.4th at 733–34.

Appeals under Federal Rule of Civil Procedure 23(f) are limited and do not permit a general inquiry into the merits of the plaintiff's claims; nevertheless, we "must[] review the merits of the district court's theory of liability insofar as they also concern issues relevant to class certification." *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 381 (5th Cir. 2007). It logically follows that we have jurisdiction to review the merits of the district court's theory of liability insofar as the denial of class certification was based on its conclusion that the Plaintiffs, including the

named Plaintiffs, lacked Article III standing. *See Bertulli*, 242 F.3d at 294–95 (considering merits of defendants' contention regarding standing).

### A.    Forfeiture

As a threshold matter, Superior contends the Plaintiffs forfeited any challenge to the district court's determination that the Plaintiffs failed to provide sufficient evidence of injury in fact. Superior urges our court to affirm on that basis.

The Plaintiffs challenge the legal standard employed by the district court regarding the causation element of standing. They argue the court employed a causation standard more rigorous than the "fairly traceable" standard when it stated that the "Plaintiffs have not adequately established that the value of the service for which they paid is measured *primarily* by network size, and that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size." As further evidence, the Plaintiffs note the district court's observation that their expert's report, which modeled the relationship between network size and policy premiums, merely demonstrated "correlation, not causation." According to the Plaintiffs, the appropriate legal standard is that the injury (the premium overcharge) must be fairly traceable to Superior's conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The Plaintiffs misconstrue the district court's analysis here. Although the district court uses language that appears to invoke the causation element, ultimately its point was not whether the overcharge was fairly traceable to Superior, but instead whether the Plaintiffs were overcharged at all. In other words, as Superior correctly states, the challenged analysis relates to whether there was any injury in fact.

Superior contends that because the Plaintiffs erroneously challenge the district court's determination with arguments about causation, they

inadequately brief any challenge to the existence of an injury in fact, resulting in forfeiture of the issue. We see far more in the briefing than Superior does. The Plaintiffs devoted an entire section of their brief to challenging the court's injury-in-fact determination. "To be adequate, a brief must address the district court's analysis and explain how it erred." *Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 594 (5th Cir. 2023) (quoting *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023)). Considering the Plaintiffs' brief includes the standard of review, discusses applicable law, and explains their position regarding how the district court erred in reaching its injury-in-fact determination, the Plaintiffs did not forfeit the issue. *See id.*

To the extent Superior's forfeiture argument is based on the Plaintiffs' failure to make the specific argument that their expert's model was sufficient evidence of injury in fact, we will later explain why the Plaintiffs were not required to do so. In any event, the Plaintiffs *do* make this argument. The remainder of the Plaintiffs' issues relate to the degree of evidence required to prove injury in fact at this stage of litigation.

### B.　　*Adequacy of Evidence*

To review, the Plaintiffs' remaining issues are as follows: the district court erroneously concluded that the Plaintiffs failed to plead facts necessary to establish an injury in fact; erroneously characterized the Plaintiffs' injury theory; and impermissibly chose a side in the "battle of the experts."

Although the district court used some language to suggest its standing determination stemmed from inadequate pleadings, the better read is that its determination was based on insufficient evidence. We will proceed under the understanding that the court faulted the sufficiency of the evidence inasmuch as the court had already addressed the adequacy of the pleadings at the Rule 12(b)(6) stage.

In the district court, Superior asserted that the Plaintiffs' breach-of-contract claim was based on Superior's alleged promise to provide a network with a particular number of in-network providers. In opposing the Plaintiffs' motion for class certification, Superior challenged standing for the first time, focusing on the injury-in-fact prong. In relevant part, Superior contended the Plaintiffs could not demonstrate an injury in fact because: (1) their class-wide theory of injury was based on a promise of a network of a certain size and Superior made no such promise; and, relatedly, (2) their expert's damages model hinged on this promise that was not made and, accordingly, did not fit the facts of the case.

Apparently adopting Superior's characterization of the Plaintiffs' theory, the district court stated, "Plaintiffs' theory of their overcharge injury rests on the counterfactual assumptions that insureds were promised (or that Defendants represented) that a provider network of a certain size would be available and that provider network size, in any event, is static." Consequently, the court concluded the Plaintiffs did not "plead[] any facts supporting the claim that they had reasonable expectations of network size."

We disagree with this characterization of the Plaintiffs' theory. They do not claim that Superior promised access to a particular number of providers. Instead, they claim that the network was falsely represented as accurate, adequate, and up-to-date. As a result, each policyholder was overcharged to the extent the network was inaccurate. The size of the network is certainly relevant in determining the extent to which policyholders were overcharged, but the extent of any injury is beyond the scope of the standing inquiry. Insofar as the district court reached its standing determination by characterizing the Plaintiffs' injury theory as

resting on a "counterfactual" promise of a network of a particular size, that was error.

Turning to evidentiary matters, the district court concluded: "Plaintiffs [had] not adequately established that the value of the service for which they paid is measured primarily by network size, and that the premiums they paid were inflated as a result of the alleged discrepancy between promised network size and actual network size." Put simply, the court did not find the Plaintiffs' expert's damages model convincing.

"A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion*, 594 U.S. at 431 (quoting *Lujan*, 504 U.S. at 561). Thus, while general factual allegations of injury may suffice for a motion to dismiss, by the time a court reaches the summary-judgment stage, for example, the plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (quotation marks and citation omitted). This appeal arises at the class-certification stage — beyond the motion-to-dismiss stage but before a motion for summary judgment.

In considering a plaintiff's Article III standing in the Rule 23 context, courts accept *arguendo* the merits of the plaintiff's legal claim. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (citing *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007)); *see Warth*, 422 U.S. at 501–02. Because the Plaintiffs' ability to recover for a claim "under governing law is a separate question" from standing, "it is sufficient for standing purposes that the Plaintiffs seek recovery for an economic harm that they allege they have suffered." *Cole*, 484 F.3d at 723. A court is generally "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Krim v. pcOrder.com, Inc.*, 402 F.3d

489, 494 (5th Cir. 2005) (quoting *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004)).  We agree with an earlier panel of this court that caution should be exercised when assessing evidence of standing at the class-certification stage, especially when "some elements of standing might be said to be intertwined with the merits" that are still to be decided.  *Robertson v. Monsanto Co.*, 287 F. App'x 354, 360 (5th Cir. 2008) (unpublished); *see also* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.15 (3d ed. 2025).  In *Robertson*, a panel of this court held that where there is "substantial overlap between" standing and the merits of a plaintiff's claim, "the better course" is to treat the attack on standing "as an attack on the merits — and therefore outside the scope of [this court's] Rule 23(f) review of class certification decisions — rather than as a question of standing."   287 F. App'x at 360.  We endorse that analysis.

Here, despite concluding the Plaintiffs' expert opinion was admissible and questions about the "basis" of the expert opinion or whether its assumptions "go to the weight of and not admissibility" of the opinion, the district court used the expert opinion to conclude the Plaintiffs failed to establish a sufficient connection between network size and price.[1]  The court characterized the Plaintiff's injury argument as an "overcharge-by-fraud theory," under which the Plaintiffs "seek[] to recover for a purported economic injury rather than any risk of physical injury."  *Cf. Earl v. Boeing Co.*, 53 F.4th 897, 902 (5th Cir. 2022).  In noting that overcharge injuries typically require plaintiffs to "plead facts sufficient to demonstrate plausible expectations or affirmative misrepresentations as the basis of their injury," the district court stated that the Plaintiffs did not plead facts sufficient to

---

[1] We need not, and do not, take a position on the admissibility of the expert opinion.

show "they had reasonable expectations with respect to the size of the provider network such that the prices paid for access to the network were inflated."

Superior maintains the Plaintiffs' evidence — specifically, their expert report — was insufficient to prove injury in fact.[2]  In so doing, Superior contends the Plaintiffs were required to prove that their premiums would have been lower *but for* the alleged inaccuracies in the provider list.  In other words, the appropriate way to determine whether overpayments occurred is to compare real-world transactions to those in "a hypothetical world where the [alleged] fraud didn't happen." *Earl*, 53 F.4th at 903.

In *Earl*, the plaintiffs alleged that they paid inflated prices for airline tickets because the actual value of those tickets for most passengers was zero where the defendants concealed defects in the MAX 8 plane that posed serious risks of injury or death. *Id.* at 902.  The plaintiffs claimed that had the public known about the defects, demand for tickets would have dropped and the airlines would have been forced to lower their prices. *Id. Earl* presents superficial similarities to the instant case in that it involved a question of standing at the class-certification stage, as well as an expert report, but this is where the similarities end. *Id.*

_____

[2] Superior initially contends that the Plaintiffs provided *no* evidence to support their injury in fact, which, according to Superior, they were required to do by *Ford v. NYLCare Health Plans*, 301 F.3d 329, 332 (5th Cir. 2002) (requiring plaintiff to affirmatively prove elements of standing with record evidence at summary-judgment stage) and *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (factual attack challenging subject-matter jurisdiction requires plaintiff to show jurisdiction does in fact exist).  The Plaintiffs clearly provided evidence of injury in fact, including affidavits from the named Plaintiffs, the disputed contract, and most importantly, their expert report (a report that the district court deemed admissible).

In concluding the plaintiffs in *Earl* had not suffered an injury in fact (and thereby failed to establish standing), we found that the plaintiffs' injury theory was untenable. *Id.* at 903. The plaintiffs' theory relied "on two unsupportable inferences": (1) airlines "would have continued offering the same MAX 8 flights" even in the face of widespread public knowledge of the defect; and (2) "the FAA would have permitted airlines to fly the MAX 8 even with full knowledge of the . . . defect." *Id.* Although we referenced the plaintiffs' expert report in *Earl*, our holding was not based on the damages model's inability to measure damages relative to the injury alleged. *Id.* at 902–03. Instead, our holding was based on the premise of the effect of the wrongful conduct itself. We concluded it was an unsupportable inference to assume airline ticket prices would decrease had the defect been widely known to the public. *Id.* at 903. In fact, it was more likely that ticket prices would increase because of the shortage of available flights. *Id.*

In contrast, it is not an unsupportable inference to assume that the Plaintiffs in this case would have expected to pay less for access to an inaccurate and inadequate provider network, or, more likely, that the Plaintiffs would not have purchased the Ambetter policy at all. Moreover, unlike the plaintiffs in *Earl*, the Plaintiffs here had a contract with Superior, which promised to provide insureds with, *inter alia*: an accurate list of network providers; complete medical coverage that meets their essential medical needs and contains all of the Essential Health Benefits; a Qualified Health Plan that Superior has certified meets ACA's network adequacy requirements; and adequate access to physicians and medical practitioners and treatments or services. In short, this case is distinguishable from *Earl*.

The district court concluded the Plaintiffs failed to establish injury in fact because their expert report did not prove a causal connection between the size of the network and premium price, which is what the Plaintiffs would have to prove to prevail on the merits of their breach-of-contract claim. This

merits-based evaluation of an expert report to determine standing at the class-certification stage is improper: "[C]ourts are not to insist upon a 'battle of the experts' at the certification stage." *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005). In analogous scenarios, we have held that it is improper for the district court to resolve factual disputes when "the subject-matter jurisdiction and merits questions are coterminous." *See Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1030 (5th Cir. 2022). Contrary to Superior's assertion that the injury-in-fact question is not "coterminous" with the underlying merits, it is. *See id.*

This case is more analogous to those in which we have held the plaintiffs had standing. *See, e.g.*, *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 302 (5th Cir. 2009); *Cole*, 484 F.3d at 723. In *Mims*, the defendant alleged error in the district court's "certifying the plaintiffs' proposed [] class when the named plaintiffs lack[ed] standing to assert a claim." 590 F.3d at 302. We concluded that although the defendant framed the issue as one of standing, "the substance of its argument is that the plaintiffs fail to state a claim . . . on the merits." *Id.* Along that line, we held "there [was] no serious question that the plaintiffs [had] standing to bring this claim. They [] alleged an injury-in-fact (overpayment of premiums for title insurance issued upon refinancing their mortgage), causation (the defendants overbilled for the premiums) and redressability (if plaintiffs are successful, they will be refunded the overpayment)." *Id.*

Similarly, the Plaintiffs have alleged and provided evidence for an injury in fact (overcharges for a health insurance policy that contained materially inaccurate and insufficient provider lists), causation (the amount of overcharge is fairly traceable to the discrepancy between the promised network size and the actual network size), and redressability (if the Plaintiffs are successful, they will be refunded their overpayment). *See id.*; *Cole*, 484 F.3d at 723 (standing found at class-certification stage under overcharge

theory where "Plaintiffs s[ought] recovery for their actual economic harm (*e.g.*, overpayment, loss in value, or loss of usefulness) emanating from the loss of their benefit of the bargain"). The district court's standing determination was, in substance, a determination on the merits of the "overcharge-by-fraud" theory.[3]

Superior contends that any merits-based evaluations were proper in this context, relying on *Unger* and *Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021). Both cases pertain to evidentiary evaluations of expert opinions at the class-certification stage. In *Prantil*, we held that plaintiffs must show that their evidence satisfies *Daubert* "when the cementing of relationships among proffered class members of liability or damages or both turns on scientific evidence." *Prantil*, 986 F.3d at 575 (referencing trial-admissibility standard for expert testimony set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). In other words, "when scientific evidence is relevant to the decision to certify," the "metric of admissibility" is the same for both certification and trial. *Id.* At this stage, however, the *Daubert* inquiry should be limited to the relevance and reliability of the expert's testimony as it relates to class certification under Rule 23. *See Unger*, 401 F.3d at 323 n.6.

––––––––––––––––––––––––––

[3] Notably, the district court seemed to suggest that the named Plaintiffs have individual standing, despite ultimately concluding that they did not. Instead of dismissing the Plaintiffs' case, as would be the appropriate course of action if the named Plaintiffs truly lacked Article III standing, the district court denied class certification and set a summary judgment briefing schedule that was later stayed by stipulation pending resolution of this appeal. *See Earl*, 53 F.4th at 903 ("They have offered no plausible theory of economic harm . . . . [P]laintiffs have suffered no injury in fact and lack Article III standing. Their case therefore must be dismissed."); 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 2:6 (6th ed. 2022) ("Because individual standing requirements constitute a threshold inquiry, the proper procedure when the class plaintiff lacks individual standing is to dismiss the complaint, not to deny class certification.").

The district court's evaluation of the Plaintiffs' expert report did not remain within those limits.  The expert opinion was not relevant to the district court's decision whether to certify, as the court did not reach the certification question due to its standing determination.  Moreover, even assuming the district court ventured into a certification analysis when it evaluated the Plaintiffs' expert's damages model, none of the purported deficiencies were related to the relationships among class members to the alleged liability or damages. *See Prantil*, 986 F.3d at 575.  As the district court stated, because "exclusion is limited to an inquiry as to relevance to class certification requirements, [the expert's] testimony should not be excluded."  This shows that any qualms the district court had with the Plaintiffs' expert testimony were merits-based.

To repeat, it is improper for the district court to resolve factual disputes when "the subject-matter jurisdiction and merits questions are coterminous."  *Pickett*, 37 F.4th at 1030.  Although the Plaintiffs will ultimately have to prove whether and to what extent they were overcharged based on the inadequacy of the network, they do not need to prove how to measure that injury in dollars at the class-certification stage.  The Plaintiffs, including the named Plaintiffs, have therefore established individual standing.

## II.    Class Standing

If a named plaintiff lacks individual standing, as the district court here concluded, it is unnecessary to address whether the plaintiff has standing to represent the class.  *See Angell*, 67 F.4th at 733–34.  We have determined, however, that all the Plaintiffs have individual standing.  Consequently, we next evaluate class standing.

There are two competing approaches to class standing: the "more forgiving 'class certification' approach'" and "more intensive 'standing

approach.'" *Id.* (quoting 1 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 2:6 (6th ed. 2022)); *see Chavez*, 108 F.4th at 312. The class-certification approach analyzes only a named plaintiff's individual standing; "if that is satisfied, any remaining analysis is considered a matter of class certification under Rule 23." *Angell*, 67 F.4th at 734 (citations omitted). By contrast, the standing approach compares "the injuries or interests of the named plaintiff with those of the putative class and will hold that the named plaintiff lacks standing for the class claims if his or her harms are not sufficiently analogous to those suffered by the rest of the class." *Id.*

There is a circuit split regarding which of these is the appropriate test, and this court has so far declined to determine the correct approach. *See id.* at 733–35. We continue to decline. Like two prior panels of this court, we analyze the Plaintiffs' claims under both the class certification approach and the standing approach. *See Chavez*, 108 F.4th at 312; *Angell*, 67 F.4th at 733–34. If the Plaintiffs have demonstrated standing under each, we need not decide between the two. *See Chavez*, 108 F.4th at 312; *Angell*, 67 F.4th at 735. The Plaintiffs' injury theory — namely, that each policyholder was overcharged to the extent the network was inaccurate — applies equally to the named Plaintiffs and all other Plaintiffs. It thus satisfies the class-certification approach and the standing approach.

Therefore, on remand the district court should proceed to the Rule 23 class-certification analysis, which it did not reach after determining that the Plaintiffs lacked standing as a threshold matter.[4] We thus do not address

---

[4] We take no position on the proper outcome of the class-certification analysis.

No. 24-50044

Superior's alternative contentions regarding the Plaintiffs' inability to satisfy class-certification requirements.

## CONCLUSION

We VACATE the district court's order denying the Plaintiffs' motion for class certification and REMAND for further proceedings consistent with this opinion.